**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

U.S. ENERGY DEVELOPMENT
CORPORATION,

      Plaintiff - Appellee,

and

OSAGE EXPLORATION &
DEVELOPMENT, INC.,

      Plaintiff,

v.

STEPHENS ENERGY GROUP, LLC,

      Defendant - Appellant.

Nos. 15-6188 & 15-6215
(D.C. No. 5:14-CV-01319-C)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **MATHESON**, **McKAY**, and **O'BRIEN**, Circuit Judges.
_____

    Stephens Energy Group, LLC (Stephens), appeals from two judgments of the

district court. The first declared Osage Exploration and Development, Inc. (Osage)

the Operator of certain wells in a project area governed by the terms of Participation

_____

[*]     After examining the briefs and appellate record, this panel has determined
unanimously to honor the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
submitted without oral argument. This order and judgment is not binding precedent,
except under the doctrines of law of the case, res judicata, and collateral estoppel. It
may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1
and 10th Cir. R. 32.1.

and Operating Agreements between the parties. A second, modified judgment substituted U.S. Energy Development Corporation (USE) for Osage as Operator. We have consolidated the appeals for purposes of this order and judgment. We dismiss Stephens' appeal from the first judgment (No. 15-6188) as moot, reverse the second judgment (in No. 15-6215), and remand for further proceedings.

## BACKGROUND

In April 2011, Osage, USE, and non-party Slawson Exploration Company, Inc. (Slawson) entered into a Participation Agreement. USE and Slawson agreed to participate with Osage in the leasing, drilling, and development of lands in which Osage held a leasehold interest, known as the Nemaha Ridge Project Area (Project Area).

Under the Participation Agreement, Slawson acquired a 45 percent working interest and was named Operator of all wells in the Project Area. USE acquired a 30 percent working interest, and Osage a 25 percent working interest.

The Participation Agreement provided that the drilling of each well in the Project Area would be governed by an Operating Agreement, and "[w]here there is a conflict between the Operating Agreement and [the Participation] Agreement, [the Participation Agreement] will control." Aplt. App., Vol. II at 53. The Participation Agreement also recognized the right of each party to "assign their rights, duties, and obligations hereunder, so long as any assignment by a Party hereto is expressly made subject to the terms and conditions herein contained." *Id.* at 56.

2

The parties attached an unsigned, preprinted form of Operating Agreement as an exhibit to the Participation Agreement. The preprinted form contained some alterations but the parties did not actually prepare and sign individual Operating Agreements for individual wells or units. The form Operating Agreement, attached to the Participation Agreement, also named Slawson as Operator and included provisions for the Operator's resignation or removal and the selection of a successor Operator. It provided that if the Operator "terminates its legal existence, no longer owns an interest hereunder in the Contract Area, or is no longer capable of serving as Operator, Operator shall be deemed to have resigned without any action by Non-Operators, except the selection of a successor." *Id.* at 64. Another provision, modified from the language of the standard form, provided that a "transfer of Operator's interest to any single subsidiary, /or parent ~~or successor~~ corporation shall not be the basis for removal of Operator." *Id.*

Upon resignation or removal of the Operator, the parties were required to select a successor Operator. The successor would be "selected by the affirmative vote of two (2) or more parties owning a majority interest" in the Contract Area. *Id.*

In December 2013, the parties entered into a written and signed Partition Agreement, in which they agreed to terminate the Participation Agreement and Operating Agreement as to all lands within the Project Area, except for certain Joint Venture (JV) lands. The parties agreed that the JV lands would "remain subject to the Participation Agreement and [the Operating Agreement]." *Id.* at 117.

3

In July 2014, Slawson entered into a Purchase and Sale Agreement (PSA) with Stephens. As part of the PSA, Slawson sold all of its rights, title, and interests in the Project Area—excluding overriding royalty interests—to Stephens. Slawson agreed to transfer possession and physical operation of these assets to Stephens at closing, but did not guarantee that operations could be transferred to Stephens. The PSA provided that "transfers of operations will be subject to all necessary regulatory and third-party approvals" and that Slawson would "use its commercially reasonable efforts to assist [Stephens] in becoming successor operator." *Id.* at 182. Slawson subsequently executed assignments of its working interest in the units and wells within the JV lands to Stephens, and filed a form with the Oklahoma Corporation Commission purporting to assign to Stephens the right to operate the units and wells within the JV lands.

Relying on the Operating Agreement, Osage then asserted that Slawson's assignment of its interest in the Project Area to Stephens should be deemed Slawson's resignation as Operator. Osage proposed that a new Operator be selected. On November 5, 2014, USE and Osage voted to select Osage as successor Operator.

Stephens, successor to Slawson's interest under the PSA, refused to turn over possession of the units, wells, and records within the JV lands as Osage requested. Osage and USE then filed this suit in state court, seeking a declaratory judgment that Osage is the successor Operator and enjoining Stephens from conducting operations of any well or unit properly operated by Osage. Stephens removed the suit to federal court.

4

The parties filed cross-motions for summary judgment. The district court granted summary judgment in favor of Osage and USE, denied Stephens' motion, and entered a judgment providing injunctive relief to Osage and USE. It determined that the Operating Agreement had been incorporated into the Participation Agreement and that the intent of the parties must therefore be determined from the text of both documents. The Operating Agreement set out the terms for changing the Operator and the district court determined that those provisions must be given effect. Although Stephens argued that the position of Operator was an assignable right as contemplated by the Participation Agreement, the district court opined that nothing in the Participation Agreement indicated the parties intended to treat the position of Operator as an assignable right, and noted that Stephens cited no law to support its assertion. The district court concluded that the contractual documents showed that the parties intended the term "Operator" as a position of responsibility, not an assignable right. Finally, it determined that "Osage was properly selected as the successor Operator by a majority interest in the Project Area, as required under the Operating Agreement." *Id.*, Vol. IV at 371. Stephens appealed from the judgment, resulting in Appeal No. 15-6188.

Three days after the district court entered its judgment, Osage resigned as Operator. Stephens subsequently moved for a modification of the judgment. It noted Osage's resignation as Operator and that USE had been elected as the new Operator. The district court entered a modified judgment declaring USE the Operator of the wells in the Project Area, enjoining Stephens from conducting operations of any well

5

or unit properly operated by USE, and requiring Stephens to turn over to USE all records and data necessary for USE's performance of its duties as Operator. Stephens then filed an amended notice of appeal, resulting in Appeal No. 15-6215.

**DISCUSSION**

"We review the district court's summary judgment decisions de novo, applying the same standard as the district court." *Digital Ally, Inc. v. Z3 Tech., LLC*, 754 F.3d 802, 810 (10th Cir. 2014). "Under this standard, '[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)).

### 1. Appeal No. 15-6188 is Moot

In No. 15-6188, Stephens appeals from the district court's judgment, which declared Osage operator of the wells "which have been drilled and which are hereafter drilled in the Project Area pursuant to the terms of the Participation and Operating Agreements," and enjoined Stephens "from conducting operations or retaining records with respect to any unit or well in which Osage is the duly elected Operator." Aplt. App., Vol. V at 372. The district court's amended judgment, now in effect, substituted USE for Osage as Operator and enjoined Stephens from conducting operations or retaining records pertaining to units or wells operated by USE rather than Osage.

"We have no subject-matter jurisdiction if a case is moot." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109 (10th Cir. 2010). "The

6

crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world." *Id.* at 1110 (internal quotation marks omitted).

In light of the amended judgment, the parties do not argue that the superseded judgment in favor of Osage, which ordered only prospective declaratory and injunctive relief, has any further real-world consequences. Neither Osage nor USE has cross-appealed from the district court's modified judgment to challenge the substitution of USE for Osage. Moreover, as will be explained, Osage no longer holds an interest in the subject-matter of this appeal. Appeal No. 15-6188 is moot and will be dismissed.

**2. Appeal No. 15-6215 Should Not be Stayed Due to Osage's Bankruptcy**

After Stephens filed its opening brief, Osage filed its Suggestion of Bankruptcy in this court, noting that Osage had filed a voluntary petition for relief under Chapter 11 on February 3, 2016, and arguing this action was subject to the automatic stay under section 362(a) of the Bankruptcy Code.

On May 2, 2016, Osage notified this court that it no longer owned a justiciable interest in the subject matter of this appeal—presumably because a pending sale of Osage's assets that were impacted by this action, which had been approved by the bankruptcy court, was completed. *See* Aplee. Br. at 28 n.2 (noting pending sale of Osage's assets). Thus, Osage is no longer a real party in interest in this appeal and its bankruptcy need not further delay our disposition of the case.

Although Osage and USE suggested in their brief that it would be necessary and appropriate to substitute the purchaser of Osage's assets for Osage as a party

7

once the sale was complete, no party has confirmed the identity of the purchaser of Osage's assets, no party has moved to substitute the purchaser as a party, *see* Fed. R. App. P. 43(b), and no one has entered an appearance on behalf of the purchaser. In light of the district court's substitution of USE for Osage as Operator, and USE's continuing standing to assert its status as Operator, there appears to be no further reason to stay this appeal.

### 3. Stephens Did Not Waive its Right to Appeal

The appellees argue that by calling for an election after Osage resigned as Operator, Stephens conceded that the terms of the Operating Agreement calling for an election upon the Operator's resignation governed this dispute. They assert that by its call for an election, Stephens waived its argument that the resignation and election provisions did not control succession of the Operator after Slawson's sale of its interest to Stephens. This argument lacks merit.

Stephens called for an election of a successor Operator because it believed Osage was insolvent and unqualified to serve as Operator. Under the district court's injunctive order then in effect, Stephens could not have reasonably responded to Osage's situation by stubbornly insisting on its right to be reinstated as successor Operator based on the assignment from Slawson. The use of an election to select a successor Operator to Osage, which had unequivocally resigned as Operator, was a very different set of circumstances than those that led to the current dispute on appeal involving a purported assignment of the Operator position in connection with the sale

8

of the Operator's interest in the Project Area. Stephens did not waive its right to appeal.

### 4. Successor Operator Under the Parties' Agreement

The Participation Agreement provides that it will be governed by and construed in accordance with Oklahoma law. Aplt. App., Vol. II at 56. "In Oklahoma, as in most jurisdictions, the paramount objective of contract interpretation is to effectuate the intent of the parties as expressed by the terms of the contract." *Walker v. Builddirect.Com Techs., Inc.*, 349 P.3d 549, 552 (Okla. 2015). "Thus, unambiguous, clear, and consistent contract terms will be enforced as written to carry out the expressed intention of the parties." *Id.*

The district court determined that the parties' agreement was unambiguous, and the parties agree. The district court noted that the Operating Agreement had been incorporated into the Participation Agreement and found that the intent of the parties must therefore be determined from the text of both documents. The Operating Agreement set out the terms for changing the Operator and the district court determined that those provisions must be given effect. It reasoned as follows:

> Viewing the agreement as a whole and "each clause helping to interpret the others," it is clear that the Participation Agreement and the Operating Agreement designate Slawson as Operator and that the Operating Agreement sets out the guiding terms for the changes in that position in the future. Defendant's interpretation of the contract would render the operator resignation and selection clauses in the Operating Agreement meaningless. Such construction is to be avoided pursuant to 15 Okla. Stat. § 157. Furthermore, Defendant's argument is dependent on a determination that the position of Operator is an assignable right contemplated under the Participation Agreement. However, nothing in the Participation Agreement indicates an intent of the signing parties to

9

> treat the position of Operator as an assignable right, and Defendant has provided no law supporting this assertion. Plaintiffs assert that Operator is a position of responsibility and not a contractual and assignable right. To support this argument, Plaintiffs cite 52 Okla. Stat. § 86.1(h), which states that "[t]he term 'operator' shall mean any producer of oil or gas who has drilled a well or wells into a common source of supply and is engaged in operating such well or wells for the purpose of producing oil or gas therefrom." Under Oklahoma law, custom and usage should be considered when interpreting a contract. Applying the standard industry definition provided above to the term "Operator" in the Participation Agreement and the Operating Agreement, the Court finds that the parties intended the term "Operator" to connote a position of responsibility and not an assignable right. Based on the reasoning above, the Court finds that no conflict between the assignment clause and the operator resignation clause exists.

Aplt. App., Vol. IV at 369-70 (citations, brackets, and internal quotation marks omitted).

### A. Plain Language of the Agreement

The district court thus rejected Stephens' contention that the Operator position could be freely assigned for two reasons, neither of which can withstand scrutiny. First, the district court found that "nothing in the Participation Agreement indicates an intent of the signing parties to treat the position of Operator as an assignable right," reasoning that Stephens "has provided no law supporting this assertion." *Id.* at 369. But this analysis improperly shifted the burden on the assignability issue to Stephens.

Oklahoma law presumes that contractual rights and duties are assignable, unless the parties provide otherwise in their agreement, or unless the duty is so specialized that the identity of the performing party is material to the contract. *See, e.g.*, *Beattie v. State ex rel. Grand River Dam Auth.*, 41 P.3d 377, 381

10

(Okla. 2002) ("Oklahoma has long held that rights under a contract are presumed to be assignable, unless the parties expressly provide otherwise. . . . Oklahoma case law has also recognized that certain rights and duties are too personal in character to permit them to be assigned."). Appellees fail to show that either exception applies here. Stephens cited unambiguous language in the Participation Agreement in support of its claim that the Operator right or duty was assignable:

> Subject to the other provisions of this Agreement, this Agreement and all provisions hereof shall inure to the benefit of and be binding upon not only the Parties, but their respective heirs, successors, and assigns. *The Parties may assign their rights, duties, and obligations hereunder, so long as any assignment by a Party hereto is expressly made subject to the terms and conditions herein contained.*

Aplt. App., Vol. II at 56 (emphasis added).

Appellees draw our attention to language in the Operating Agreement's resignation clause, calling for election of a new Operator when the Operator no longer has an interest in the Project Area. *Id.* at 64.[1] But to the extent that language could be read to overcome the presumption of assignability by precluding Slawson from assigning the right to serve as Operator as part of a sale of its interest in the Project Area, it conflicts with the language in the Participation Agreement making the parties' rights, duties and obligations—not excluding the right to serve as

---

[1] Appellees also cite a provision of the Operating Agreement that specifically struck language permitting transfer of the Operator's interest to a successor corporation without removal of the Operator. *See* Aplee. Br. at 21 (citing Aplt. App., Vol. II at 64). To the extent this language precludes free assignment of the right to serve as Operator, it is further evidence of the conflict between the Participation Agreement and the Operating Agreement, which the parties agreed would be resolved in favor of the provisions of the Participation Agreement.

11

Operator—freely assignable.  Although the Participation Agreement and the Operating Agreement must be considered together as parts of a single transaction, *see* Okla. Stat. tit. 15, § 158, the parties unambiguously agreed that where a conflict existed between the two writings constituting their agreement, the language in the Participation Agreement would govern.[2]  Thus, the record fails to support the district court's conclusion that the plain language of the agreement made Slawson's right to serve as Operator unassignable.

## B. "Custom and Usage" in the Oil and Gas Industry

The district court also cited "custom and usage" in the oil and gas industry, which purportedly would treat the position of Operator as a "position of responsibility" rather than an assignable right.  Aplt. App., Vol. IV at 369.  Leaving aside the fact that the parties' agreement permitted them to "assign their rights, *duties, and obligations* hereunder," *id.* at 56 (emphasis added)—language which appears to include the assignment of a position of responsibility as well as a right— we do not find the district court's reasoning concerning custom and usage persuasive.

Oklahoma law provides that "[t]he words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning, unless used by the parties in a technical sense, *or unless a special meaning is given to*

---

[2]      Appellees note that any assignment of Slawson's interest was "expressly made subject to the terms and conditions herein contained," Aplt. App., Vol. II at 56, and that Slawson's right to serve as Operator was expressly limited by the terms of their agreement.  One of these terms and conditions, of course, was that in the event of a conflict between the Participation Agreement and the Operating Agreement, the Participation Agreement would govern.

12

*them by usage*, in which case the latter must be followed." Okla. Stat. tit. 15, § 160 (emphasis added). It also provides that "[a] contract is to be interpreted according to the law *and usage* of the place where it is to be performed, or, if it does not indicate a place of performance, according to the law *and usage* of the place where it is made." *Id.* § 162 (emphasis added). The question is whether usage in the oil and gas industry gives the term "Operator" a special meaning that excludes it from the general presumption that contractual rights and duties are freely assignable. Such a usage has not been established here.

As evidence of industry "custom and usage," the district court cited Okla. Stat. tit. 52, § 86.1(h), a provision of Oklahoma's Oil and Gas Conservation Act defining the term "Operator." That provision (currently renumbered as § 86.1(8)), reads: "'Operator' means any producer of oil or gas who has drilled a well or wells into a common source of supply and is engaged in operating the well or wells for the purpose of producing oil or gas therefrom[.]" The district court found that this language provided evidence that an "Operator" position is not an assignable right. But we fail to discern such a special meaning in the quoted language. To define an Operator with reference to its duties or functions does not preclude the assignment of the right or responsibility to serve in that capacity.

Moreover, Oklahoma Supreme Court precedent specifically precludes use of the definition in § 86.1(h) to establish industry custom or usage for purposes of construing a private contract. In *Pitco Production Co. v. Chaparral Energy, Inc.*, 63 P.3d 541 (Okla. 2003), the Oklahoma Supreme Court discussed whether it could

13

consider oil and gas industry usage to determine whether the term "Operator" used in the parties' operating agreement permitted the existence of multiple operators within a single unit. The court determined for a number of reasons that it should not consider industry usage in resolving this question.

First—as in this case—the terms and provisions of the parties' agreement were unambiguous. Second, the term "Operator" carried no technical significance in the oil and gas industry, and therefore required no evidence of industry usage to clarify the term. The court concluded that "[b]ecause we hold the [Joint Operating Agreement's] terms plain and unambiguous, we cannot consider Pitco's adduced proof that it is common industry practice to allow more than one operator per unit area." *Pitco*, 63 P.3d at 547.

Most significantly, in a footnote to its decision, the Oklahoma Supreme Court cited the same statutory definition of "Operator" that the district court cited in this case, and opined that "[t]he Oil and Gas Conservation Act, 52 O.S. 1991 §§ 86.1 et seq., does not affect the controversy before us because it applies to the regulatory power of the Corporation Commission, *and the dispute here is a private-law matter*. This general description of an 'operator' neither provides nor requires specific, technical knowledge to further illuminate the meaning of the term." *Pitco*, 63 P.3d at 546 n.24 (emphasis added). The same reasoning precludes the district court's reliance on the "Operator" definition in § 86.1(8) in this case.

We can easily distinguish the other Oklahoma cases appellees cite purporting to show the status of Operator is not a vested and assignable right. In both *Oxley v.*

14

*General Atlantic Resources, Inc.*, 936 P.2d 943, 944 (Okla. 1997) and *Duncan Oil Properties, Inc. v. Vastar Resources, Inc.*, 16 P.3d 465, 467 (Okla. Ct. App. 2000), the parties' operating agreements unambiguously provided for an election for a new Operator if the existing Operator sold his interest in the unit. That is not the case here. *Crest Resources & Exploration Corp. v. Corporation Commission*, 617 P.2d 215 (Okla. 1980), is also not on point because that case concerned the Oklahoma Corporation Commission's use of police power in a forced pooling situation. *See id.* at 217-18.

## C. Meaningfulness of Resignation and Selection Clauses

Oklahoma law provides that a contract must be construed "so as to give effect to every part, if reasonably practicable." Okla. Stat. tit. 15, § 157. The district court stated that Stephens' interpretation of the parties' agreement, which permitted Slawson to assign its contractual right to serve as Operator to Stephens, would "render the operator resignation and selection clauses in the Operating Agreement meaningless." Aplt. App., Vol. IV at 369. In their appellate brief, the appellees argue strenuously that Stephens' interpretation essentially nullifies these clauses. *See* Aplee. Br. at 10; *see also id.* at 17 (arguing Stephens' interpretation requires that Slawson's successors must be appointed Operator in perpetuity, and will remain as Operators "forever without any mechanism to remove or replace the Operator even if the Operator were to declare bankruptcy, sell its working interests, or commit bad acts."); *id.* at 21 ("If Stephens' argument is correct, Non-Operators would be

15

prevented from ever calling for an election."). But these arguments misread the parties' agreement.

Contrary to appellees' contentions, giving effect to the parties' agreement that rights and duties under the Participation Agreement were freely assignable does not render meaningless the provisions permitting removal of an Operator for good cause, deeming a bankrupt or insolvent Operator to have resigned, or permitting an Operator to voluntarily resign by giving written notice. Appellees fail to show that Stephens' claim that Slawson possessed an assignable "right" fails merely because the continued exercise of that right was conditioned on financial stability or good conduct, or because Slawson could choose to forego the right by resigning. Under the circumstances presented here, Stephens' interpretation concerning free assignability affects only the situation where a conflict arises because an existing Operator sells its rights and therefore no longer owns an interest in the Contract Area. Adopting Stephens' interpretation does not make even the clause deeming an Operator to have resigned when it no longer holds an interest, *meaningless*. Notwithstanding the parties' intent to permit free assignability of the Operator position, the clause could still permit a deemed resignation, followed by an election. For example there could be a post-resignation election in circumstances where an Operator lost its interest in the Project Area without purporting to transfer the right to serve as Operator to a qualified successor.

**CONCLUSION**

Appeal No. 15-6188 is dismissed as moot. In Appeal No. 15-6215, we reverse the judgment of the district court and remand for further proceedings.

Entered for the Court

Monroe G. McKay
Circuit Judge